UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SABATINI FROZEN FOODS, LLC,

                     Appellant,

       - against -

LORI LAPIN JONES AS TRUSTEE IN
BANKRUPTCY OF ACME CAKE CO., INC.
AND PHOENIX BAKING CO., INC.,

                     Appellees.
------------------------------------------------------------X
In re:

ACME CAKE CO., INC.,

                     Debtor.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

11-CV-1294 (SLT)

**TOWNES, United States District Judge:**

      Appellant Sabatini Frozen Foods, LLC ("Sabatini") appeals from a January 11, 2011, order ("Sale Order") approving the sale of certain assets of Debtor Acme Cake Co., Inc., ("Acme")'s estate, on the ground that the United States Bankruptcy Court for the Eastern District of New York (Carla E. Craig, B.J.) erred in finding that Appellee Phoenix Baking Co., Inc. ("Phoenix") was a good faith purchaser. For the reasons set forth below, the Sale Order is affirmed.

I.   BACKGROUND

   A.   **Bankruptcy Proceedings**

      1.   **Chapter 11**

Acme is owned by shareholders William Wenzel (50%) and Thomas Semon (50%). (Trustee Br. at 3). On April 2, 2008, Acme filed a voluntary Chapter 11 petition in the Bankruptcy Court precipitated by the entry of a $1.8 million jury verdict against it and in favor of Sabatini. (Case 08-41965 Docket ("Ch. 11 Docket") No. 94-1 ¶ 10). During the course of the Chapter 11 proceedings, Phoenix – an entity jointly owned by William Wenzel (15%); Gail Fanny, Wenzel's sister (51%); the Wenzel Family Trust (10%), and two unrelated individuals (24%) – sought to purchase substantially all of Acme's assets for $450,000. (Ch. 11 Docket Nos. 178-1 ¶ 3; 193 at 7-8; Trustee Br. at 3). Sabatini opposed the motion, (Ch. 11 Docket No. 186), and Acme ultimately withdrew it, (Ch. 11 Docket No. 241). On October 18, 2010, the Bankruptcy Court dismissed the Chapter 11 action. (Ch. 11 Docket No. 303).

      2.   **Chapter 7**

On October 20, 2010, four creditors (who are not parties to this appeal) filed an involuntary Chapter 7 petition against Acme in the Bankruptcy Court. (Case 10-49857 Docket ("Ch. 7 Docket") No. 1). On November 23, 2010, Lori Lapin Jones (the "Trustee") was appointed as the interim Chapter 7 trustee tasked with marshaling and liquidating Acme's assets. (Ch. 7 Docket No. 20).

         a.   **Appraisal and Negotiations**

Shortly after the appointment, counsel for Phoenix contacted the Trustee's counsel to express interest in purchasing the Acme assets. (Ch. 7 Docket No. 26 at 3). The Trustee represented to the Bankruptcy Court that her counsel "engaged in arms'-length negotiations with

counsel to Phoenix regarding the specific terms of the sale of the Debtor's assets." (Ch. 7 Docket No. 26 at 3). On December 6, 2010, the Trustee received a formal offer from Phoenix to purchase all of Acme's tangible assets, as well the company name, phone/fax numbers, all intellectual property, and the debt of B&T Properties ("B&T"), for $275,000. (Ch. 7. Docket No. 26 at 3-4). B&T is owned by William Wenzel and Tomas Semon, his brother-in-law. (Ch. 7 Docket No. 65, Transcript of Jan. 5, 2011, hearing ("Tr.") at 18).

On December 9, 2010, the Trustee conferred with principals from Caspert Management Co. Inc. ("Caspert"), who represented they had no connection to Acme, other than being contacted in April 2010 to prepare an appraisal of its tangible assets ("Appraisal"). (Ch. 7 Docket No. 26 at 4). In the Appraisal, Caspert had estimated the forced liquidation value of Acme's food processing equipment at $54,210. (Ch. 7 Docket No. 26 at 4). Caspert estimated that the value of additional relevant items did not exceed $2,500. (Ch. 7 Docket No. 26 at 4-5). As to Acme's inventory of perishables and baking supplies, the Trustee determined that their value was "substantially less (if anything at all)" than the price paid by Acme. (Ch. 7 Docket No. 26 at 5). Acme's formulas and/or recipes were of nominal value because they were not patented or confidential. (Ch. 7 Docket No. 26 at 5). Similarly, Acme's intellectual property, as well as its name, phone and fax numbers, held no significant value. (Ch. 7 Docket No. 26 at 5). Considering the debt of B&T to Acme, evidenced by a book entry (not a note) for $365,000, the Trustee determined that litigation was likely and that collection itself "might also be problematic." (Ch. 7 Docket No. 26 at 6).

### b. Proposed Sale

On December 14, 2010, the Trustee and Phoenix entered into a letter agreement providing for the sale of Acme's assets free and clear of all liens, claims and encumbrances,

subject to higher or better offers and the Bankruptcy Court's approval. (Ch. 7 Docket No. 26 at 5-6). The Trustee filed a motion seeking the Bankruptcy Court's approval the following day. (Ch. 7 Docket No. 26). On December 29, 2010, Sabatini filed objections to the proposed sale – the only interested entity or creditor to do so – arguing that "the proposed sale is effectively closed to outside bidders . . . because there is no lease available to [them] and they would only be buying individual assets," while Phoenix can use the premises as an ongoing concern because it is "controlled by Wenzel's family," (Ch. 7 Docket No. 35 ¶¶ 5, 6). Sabatini's position, at bottom, was that William Wenzel, "as the president of [Acme] and a principal of Phoenix, is doing in this Chapter 7 case exactly what he could not do in the Chapter 11 case, i.e., selling the debtor's assets back to himself," therefore demonstrating "a lack of good faith and/or collusion." (Ch. 7 Docket No. 35 ¶¶ 4, 8). Additionally, Sabatini contended that by including the B&T debt in the proposed sale, William Wenzel would be able to "eliminate[] Semon as his partner in B&T," with whom he had a falling out, "and to consolidate legal title of the B&T property into the Acme complex." (Ch. 7 Docket No. 35 ¶ 41). Sabatini argued that the time constraints on the sale, over the holiday season, also prevented at least two entities from pursuing their interest properly. (Ch. 7 Docket No. 36 ¶ 10).

On January 4, 2011, the Trustee filed a response, arguing that Sabatini was attempting to quash the sale and dismiss the case in order to "resume seizing the Debtor's assets to the detriment of all other creditors." (Ch. 7 Docket No. 38 at 1-2). The Trustee asserted that the Bankruptcy Court's role was to evaluate whether the sale was in the best interest of the estate based upon the circumstances of the case, not a hypothetical set of facts. (Ch. 7 Docket No. 38

at 2).[1] The Trustee represented that she had engaged in arms'-length negotiations with Phoenix and ultimately accepted an "offer significantly higher" than Phoenix had originally proposed. (Ch. 7 Docket No. 38 at 5). The Trustee explained the marketing efforts undertaken for the sale, including publication in the New York Times; notice to all known creditors; discussions with an independent auctioneer; personally showing the machinery and equipment to four parties on three separate dates; and personally responding to inquiries from other potential bidders and partial-bidders who ultimately did not seek to view the assets. (Ch. 7 Docket No. 38 at 5-6). The Trustee received no additional bids and contested Sabatini's submission regarding two allegedly interested purchasers. (Ch. 7 Docket No. 38 at 6-7). The Trustee represented that the reduction by five days of the typical 21 days' notice (due to the expiration of Phoenix's financing commitment) was inconsequential. (Ch. 7 Docket No. 38 at 7). Moreover, she argued that the Trustee could not sell Acme's assets as a going concern because there was no lease and that even if there were, it was entirely speculative that such sale would generate greater net proceeds. (Ch. 7 Docket No. 38 at 8).

### c. Sale Hearing

On January 5, 2011, the Bankruptcy Court conducted a hearing on the motion for sale. (Ch. 7 Docket No. 65). Sabatini objected to the proposed sale, arguing that the terms and timing of the marketing had the effect of dissuading unaffiliated parties from engaging in the bidding process, rendering the sale to Phoenix a product of collusion. To address these allegation,

---

[1] The Trustee noted that the proposed sale did not include releases or exculpations to insiders, so that "if Sabatini is correct in its assertions that improper conduct of insiders placed the Trustee and the Debtor in a position such that assets could not be maximized for creditors," the Trustee could pursue those claims for their benefit after an investigation. (Ch. 7 Docket No. 38 at 2).

5

substantial portions of the hearing focused on (1) availability of a lease as an item for sale; (2) valuation of the debt owed by B&T to Acme and; (3) the timing of the bidding period.

As an initial matter, the Bankruptcy Court found – and Sabatini's counsel conceded – that the Trustee had no lease to offer. (See, e.g., Tr. at 49-50, 94-95, 115, 160). The Bankruptcy Court credited the Trustee's observation that "[a]ny sophisticated bidder would then go to the landlord and see if they could negotiate a lease . . . . It happens all the time. I said I as trustee don't have a lease." (Tr. at 160). With regard to the B&T debt, the Trustee testified that $175,000 was a reasonable value because the debt was not evidenced by a note and collection would likely require litigation. (Tr. at 29, 33). The Bankruptcy Court agreed. (Tr. at 152, 170). Finally, Semon testified that he was unable to form a consortium to place a timely bid because the bidding took place over the winter holidays and under inclement weather conditions. (Tr. at 145-46). The Trustee testified that allowing an additional five to ten days would probably not generate additional bids and might instead jeopardize the only live bid. (Tr. at 22).

The Bankruptcy Court ultimately found "no evidence of collusion or efforts to chill the bidding" and approved the sale with the understanding that if Phoenix obtained a financing extension, the Trustee would seek out other bidders. (Tr. at 171, 172). Overruling the objections, the Bankruptcy Court noted that "it is probably true that an insider has an inherent advantage in this type of situation, both because of the affiliation with the landlord and because of their knowledge of the business that's being offered for sale, but that does not make . . . their offer anything other than the highest and best, indeed the only offer, nor does it create a situation where there is bad faith." (Tr. at 171-72).

### B. Sale and Appeal

On January 11, 2011, the Bankruptcy Court signed the Sale Order, determining that "[i]n the absence of a stay pending appeal, Phoenix will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in closing on the sale of the Assets after the entry of this Order." (Ch. 7 Docket No. 43 at 3 ¶ h). Sabatini did not seek a stay of the Sale Order, (Trustee Br. at 7; Sabatini Br. at 12), and the sale to Phoenix was consummated on January 25, 2011, after an extension of the bidding deadline failed to generate additional bids, (Trustee Br. at 7).

On March 17, 2011, Sabatini filed notice of appeal in this Court from the Sale Order. (Docket No. 1). After several extensions, the appeal was fully briefed on June 30, 2011. (Docket No. 15). In support of its appeal, Sabatini argues that (1) the failure to present the availability of a lease to outside bidders chilled the bidding process; (2) the time constraints for bidding "artificially" created by Phoenix's bank made it "almost impossible" to properly market and advertise Acme as a going concern; and (3) the valuation and inclusion of the B&T debt undermined the good faith status of Phoenix. The Trustee counters that the Bankruptcy Court properly considered and rejected these arguments regarding Phoenix's good faith status and that Sabatini's appeal is moot.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Under 28 U.S.C. § 158(a), district courts are vested with appellate jurisdiction to "affirm, modify, or reverse a bankruptcy judge's judgment, order or decree." Fed. R. Bankr. P. 8013. A bankruptcy court's legal conclusions are reviewed de novo, but factual findings are reversed only when "clearly erroneous," id., so that "the party that seeks to overturn them bears a heavy

burden," In re Lehman Bros. Holdings, Inc., 415 B.R. 77, 83 (S.D.N.Y. 2009) (quoting H&C Dev. Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 565 (2d Cir. BAP 1999)). Mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.), 554 F.3d 300, 316 n.11 (2d Cir. 2009). Whether a purchaser acted in good faith "is a mixed question of law and fact." Licensing by Paolo, Inc. v. Sinatra ( In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997) ("Gucci II").

### B.     Good Faith Purchaser Inquiry

With regard to reversal or modification a bankruptcy court's order of sale, 11 U.S.C. § 363(m) provides that such action "does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith . . . unless such authorization and such sale . . . [was] stayed pending appeal." The policy objective of this rule is to allow finality and maximize profits in bankruptcy sales, because without finality "potential buyers would discount their offers to the detriment of the bankrupt's estate by taking into account the risk of further litigation and the likelihood that the buyer will ultimately lose the asset, together with any further investments or improvements made in the asset." In re Baker, 339 B.R. 298, 303 (E.D.N.Y. 2005) (quoting United States v. Salerno, 932 F.2d 117, 123 (2d Cir. 1991)). Accordingly, "appellate jurisdiction over an unstayed sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser." Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 105 F.3d 837, 839 (2d Cir.1997) (emphasis in original); see also In re Borders Group, Inc., 453 B.R. 477, 485 n.4 (Bankr. S.D.N.Y. 2011) ("The overwhelming weight of

8

authority concludes that section 363(m) protects a good faith sale from an unstayed appellate challenge, including where the sale is approved free of interests.").

In this case, Sabatini did not move to stay the sale of Acme's assets. The only issue before this Court on appeal therefore is whether Phoenix was a good faith purchaser. See Gucci II, 126 F.3d at 838. Such status is lost if the court finds "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Bace v. Babitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (quoting Gucci II, 126 F.3d at 390). It is important to note, however, that "[t]he good faith inquiry is limited to the purchaser's 'conduct during the course of the sale proceedings.'" Id. (quoting Gucci II, 126 F.3d at 390). Moreover, while a court may consider whether a potential purchaser is an insider as part of its § 363(m) analysis, "[i]t is not 'per se bad faith' for an insider to purchase assets of a debtor, and 'a sale to him without more would not suffice to show a lack of good faith.'" In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (quoting In re Andy Frain Servs., Inc., 798 F.2d 1113, 1125 (7th Cir. 1986)); see also In re Xact Telesolutions, Inc., No. Civ.A. DKC 2005-1230, 2006 WL 66665, at *6 (D.Md. Jan. 10, 2006) ("[T]he majority of courts have held that a sale of assets to a fiduciary or insider is not bad faith per se.") (collecting cases). Instead, as noted, "[t]he affirmative focus is the probity of the purchaser's conduct during the course of the sales proceeding." In re Bakalis, 220 B.R. at 537.

### 1. Lease

Sabatini maintains that the absence of a lease to Acme's premises chilled bidding activity because prospective outside bidders would face significant expense to remove the assets, while Phoenix would be able to pay liquidation value for assets it could operate onsite as a going concern. (Sabatini Br. at 15). At the sale hearing, the Bankruptcy Court found that no lease was

available to market based upon William Wenzel's uncontroverted testimony that Acme had been a month-to-month tenant of its affiliate landlord and had never entered into a lease agreement.[2] (Tr. 90-91). A review of the record does not reveal any clear error with respect to this finding, nor with the Bankruptcy Court's observations that the Trustee could not require the landlord to offer a lease as part of the estate sale and that any interested party was free to initiate lease negotiations – though none did. (Tr. at 94-95, 153-54).

Moreover, there is no evidence in the record that the affiliate status of the landlord was created as a mechanism to disadvantage outside bidders. Phoenix's inherent advantage as an insider cannot alone form the basis for invalidating its good faith purchaser status.[3] Although the availability and inclusion of a lease to Acme's premises – with the attendant ability to operate a bakery as a going concern – may have made the estate assets more attractive to outside bidders, such a scenario is entirely hypothetical and divorced from the circumstances as the Trustee found them.

---

[2] Sabatini's insistence that the Trustee should have marketed an "available" lease based on William Wenzel's testimony that he "would have to consider" a potentially worthy lessee, (Tr. at 136), is without merit. (Sabatini Br. at 14-15).

[3] Sabatini has also suggested that the operation of Quality Bakers, another Acme/Phoenix affiliate, on Acme's premises during the pendency of the bankruptcy cases undermines Phoenix's good faith purchaser status. That argument is unavailing. Past conduct, even illegal conduct, on the part of a purchaser with no adverse impact on the sale price or bidding process does not vitiate good faith purchaser status. See Gucci II, 126 F.3d 391-92 (finding purchaser's harassment campaign and overseas litigation against debtor in violation of automatic stay did not undermine purchaser's good faith status); Gross v. Russo (In re Russo), 762 F.2d 239, 243 (2d Cir. 1985) ("The integrity of the sale is the issue to be addressed – not any general past conduct of a bidder in relation to other matters."); In re Triangle Transp., Inc., 419 B.R. 603, 619 (Bankr. D.N.J. 2009) (granting good faith purchaser status to insider despite evidence it removed estate property from debtor premises in violation of automatic stay). The Trustee also explained at the sale hearing that she would conduct an investigation and that "if Quality did something that they should not have done and it amounts to a collectible cause of action, I will bring that cause of action." (Tr. at 27).

### 2. Bidding Period

Sabatini further contends that the time constraints imposed on the bidding process undercut Phoenix's good faith purchaser status. (Sabatini Br. at 17). Sabatini alleges that Phoenix "artificially created" a truncated period over the winter holiday season by relying on a bank commitment letter set to expire by January 7, 2011. (Sabatini Br. at 17). The evidence indicates, however, that extending the bidding period by five to ten days would not have generated additional bidding activity; indeed, an extension of the deadline to January 11, 2011, failed to generate a single outside bid. The Bankruptcy Court's findings are further buttressed by the Trustee's testimony that she made herself and the Acme assets fully available to potential bidders. (Tr. at 19-20). Sabatini has offered no evidence to show that Phoenix's conduct or the timing of the bidding period had any effect on the generation of bids.

### 3. B&T Debt

As an initial matter, the Court is satisfied the Trustee made a proper valuation of Acme's assets. Although the aggregate purchase price was substantially lower than the offer Phoenix made during the pendency of the Chapter 11 action, the difference is reasonable given the rapidly deteriorating perishable inventory and the fact that the Chapter 11 valuation included releases, accounts receivable, and administrative debt. (See Tr. at 13, 63-64). With regard to the disputed value of the B&T debt, the Court is not left with a "definite and firm conviction that a mistake has been committed." Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003). There simply is no evidence in the record to show that the $175,000 figure, based on the potential litigation and collection issues, (Tr. at 33), was the product of collusion. Moreover, the inclusion of the B&T debt does not in and of itself suggest intent to control the sale. Although Phoenix may well have been the only bidder interested in the B&T debt, the Trustee testified that she affirmatively

permitted and solicited bids that excluded that asset. (Tr. at 21). Certainly the inclusion of the B&T debt, which raised the price of the aggregate offer, inured to the benefit of the estate. In any event, the Bankruptcy Court's assessment of the facts related to this argument is supported by the record and is not clearly erroneous.

In sum, this Court is satisfied that the Bankruptcy Court did not commit reversible error in determining Phoenix's good faith status pursuant to § 363(m). Having sought no relief beyond challenging the validity of the sale, Sabatini's request for relief therefore is moot. See In re Lehman Bros., 415 B.R. at 85.

## III. CONCLUSION

For the reasons set forth above, the Bankruptcy Court's January 11, 2011, Sale Order is affirmed and the appeal is dismissed. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

_____/S/_____
SANDRA L. TOWNES
United States District Judge

Dated: March 29, 2013
Brooklyn, New York